# HAUSFELD

415.633.1908 ph
415.358.4980 fax

44 Montgomery Street
Suite 3400
San Francisco, CA 94104

October 3, 2012

**VIA OVERNIGHT DELIVERY**   **ORAL ARGUMENT REQUESTED**

Hon. Victor Marrero
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Suite 660
New York, New York 10007

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/9/12



RECEIVED OCT 5 - 2012 CHAMBERS OF JUDGE MARRERO

   RE:   *Woori Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.,*
         S.D.N.Y. Case No. 12 CIV 3993 (VM) (FM)

Dear Judge Marrero:

   We write on behalf of Plaintiff in response to the letter brief submitted on September 20, 2012 by Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch International, Inc., Merrill Lynch & Co. and Bank of America Corporation (collectively "Defendants").[1] Defendants seek to have Plaintiff's case dismissed on the grounds that the Korean statute of limitations applies the relevant limitations rule, and that the Korean limitations period has expired. Defendants are wrong on both counts.

## Background

   Plaintiff filed a complaint against Defendants (Dkt. 1) on May 18, 2012 alleging causes of action sounding in fraud, negligent misrepresentation, and unjust enrichment arising from the sale of collateralized debt obligation ("CDO") notes to Plaintiff. Plaintiff alleges that it thought that it was purchasing a safe long-term investment that paid a moderate interest rate, with low risk. In reality, recent disclosures by the Financial Crisis Inquiry Commission ("FCIC"), a commission that was created for the *purpose* of "examin[ing] the causes of the current financial and economic crisis in the United States, specifically the role of . . . fraud and abuse in the financial sector"[2], established that Defendants were engaged in fraudulent and deceptive conduct with respect to the structuring and sale of CDOs. *See* Compl. ¶81. The massive fraud disclosed by the FCIC in its report, which was released

---

[1] Taberna Preferred Funding VI, Inc. joins in Defendants' motion.

[2] The FCIC was created by section 5 of the Fraud Enforcement and Recovery Act of 2009 ("Public Law 111-21"), which was signed into law on May 20, 2009. Public Law 111-21(5)(c)(1) directed the FCIC "[t]o examine the causes of the current financial and economic crisis in the United States", including: "(A) fraud and abuse in the financial sector"; "(H) credit rating agencies in the financial system, including reliance on credit ratings by financial institutions and federal financial regulators, the use of credit ratings in financial regulation, and the use of credit ratings in the securitization markets"; "(P) derivatives and unregulated financial products and practices, including credit default swaps"; "(R) financial-institution reliance on numerical models, including risk models and credit ratings"; and "(V) the quality of due diligence undertaken by financial institutions." Public Law 111-21(5)(d)(1) and (d)(2) authorized the Commission to "hold hearings, sit and act at times and places, take testimony, receive evidence, and administer oaths" and "require, by subpoena or otherwise, the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, and documents." *See* http://www.gpo.gov/fdsys/pkg/PLAW-111publ21/html/PLAW-111publ21.htm.

Judge Marrero
Page 2

on January 27, 2011, provided specific and detailed evidence that Defendants knew that the ratings assigned to the CDOs were false when made (Compl. ¶¶78-80; 84-91) and that the CDOs were built upon massive amounts of defective mortgages that had been waived into the securitization pools (Compl. ¶75). The FCIC supported its findings with specific testimony taken from key participants in the industry and the report carried the imprimatur of credibility from the U.S. government.

### Plaintiff's Claims Are Timely Under New York Law

At the August 9 case management conference, the parties discussed (and the Court ordered) a streamlined approach to Rule 12 briefing in which the first issue to be briefed would be the proper construction and application of the Korean statute of limitations. However, subsequent developments have established that New York's borrowing statute does *not* apply here, and accordingly New York, not Korea, supplies the relevant statute of limitations. In the interests of expediency and judicial economy, Plaintiff briefs its argument on this threshold issue before turning to an analysis of the Korean statute of limitations.

New York's borrowing statute, N.Y. CPLR §202, provides as follows:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

In *Antone v. General Motors Corp.*, 473 N.E.2d 742, 484 N.Y.S.2d 514 (1984) ("*Antone*") the Court of Appeals explained: "We thus hold that "resident" as used in CPLR 202 does not have the same meaning as "domiciliary". Rather, the determination of whether a plaintiff is a New York resident, for purposes of CPLR 202, turns on whether he has a significant connection with some locality in the State . . . ." *Id.* at 746; 518. *See also id.* at 745; 517 ("New York has long recognized that 'residence' and 'domicile' are not interchangeable. In 1908 this court noted that the two terms are not identical, recognizing, for example, that while a person can have but one domicile he can have more than one residence."). Here, it is clear that Plaintiff is a resident of New York. It maintains an office in Manhattan, has more than two-dozen employees in the state, pays taxes to the state, is chartered and regulated by the New York Banking Department, and otherwise conducts substantial business here on a *daily* basis. *See* Declaration of Manho Kim ("Kim Decl."). Plaintiff's presence in New York subjects it to the full panoply of the state's regulatory and legal regime—both the burdens *and the benefits*—such that it can fairly be said to have "a significant connection with some locality in the State."[3]

Accordingly, application of New York's statute of limitations applies and Plaintiff's claims are timely. For example, N.Y. CPLR §213(8) provides that "an action based upon fraud; the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." *See also Reilly Green Mountain Platform Tennis v. Cortese,* 28 Misc.3d 1234(A), 2007 WL 7263362, *10 (N.Y.

---

[3] Defendants will undoubtedly oppose this argument on the grounds that Plaintiff does not maintain its principal place of business in New York and will cite a number of non-binding authorities in support of its position. Most of these cases pre-date the expansive language of *Antone*, or do not consider it, and none provides the type of comprehensive evidence of presence in the state shown by Plaintiff here.

Sup. Nov. 14, 2007); *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F.Supp.2d 41, 62-63 (E.D.N.Y. 2011) (§213 applies to negligent misrepresentation claims sounding in fraud); *Cohen v. Cohen*, 773 F.Supp.2d 373, 396-97 (S.D.N.Y. 2011) (6 year limitations period applies to unjust enrichment claim).

### Plaintiff's Claims Are Not Barred By Korean Law

Even assuming that Korean law provides the relevant statute of limitations, Plaintiff's claims are timely. Korea Civil Act, Article 766 (Prescription In Respect Of Right To Claim for Damages) ("Article 766") provides as follows:

> (1) The right to claim for damages resulting from an unlawful act shall lapse by prescription if not exercised within three years commencing from the date on which the injured party or his agent by law becomes aware of such damage and of the identity of the person who caused it.
> (2) The provisions of paragraph (1) shall also apply if ten years have elapsed from the time when the unlawful act was committed.

The parties agree that the three-year limitations period under Article 766(1) begins to run when the injured party becomes practically and specifically aware of the facts constituting the elements of its claims, i.e., the fact that damages were incurred, the existence of unlawful act(s), and a substantial causal relationship between such unlawful act(s) and damages. While it is not necessary for the injured party to have specific knowledge of the exact degree and amount of damages, when such injured party is deemed to have had practical and specific awareness as to the elements of its claims should be reasonably determined based on the circumstances under which the claim for damages became possible from a practical perspective, taking into account the totality of the objective evidence in each case.

Defendants suggest that this standard is identical to New York's inquiry notice standard and that the Court can look to New York decisional law to resolve their motion. But the laws of Korea and New York are not interpreted in the same way, and this Court may not apply New York's inquiry notice standards here. As demonstrated by the Declaration of the Honorable Suk-Soo Kim and Si Yoon Lee[4] in Opposition to Defendants' Motion to Dismiss the Complaint ("Expert Decl."), the Korean Supreme Court applies its three year statute of limitations in a manner that provides significant deference to the "practical ability" of a plaintiff to bring a claim. This material qualifying consideration requires an analysis of facts and circumstances not necessarily considered in an inquiry notice analysis under U.S. law. For example, due to fundamental differences in culture and legal procedure between Korea and the United States, the Korean Supreme Court has routinely ignored "facts" that might provide inquiry notice under U.S. precedent. Unlike the litigation culture in the U.S., where claimants often sue first and ask questions later, Korea's Supreme Court decisions reflect a cultural preference for delaying litigation until all of the relevant facts have been gathered and considered.[5] And because there is no equivalent right to discovery in Korea, this frequently requires a

---

[4] The Honorable Suk-Soo Kim is a former justice of the Supreme Court of Korea. He is the former Prime Minister of that country and has held numerous other prominent positions in Korea during his career. *See* Expert Decl., pp. 2-3. The Honorable Si-Yoon Lee is a recognized expert in Korean civil procedure and has served as a judge on the Constitutional Court of Korea. He has been appointed as the presiding judge in numerous district courts throughout Korea during his career and has served as chairman of numerous committees concerning the development of civil procedure in Korea. He is a former law school dean. *See* Expert Decl., pp. 3-4.

[5] An article authored by Tae Hee Lee, Esq., a senior partner at one of Korea's premier law firms, Lee & Ko, titled "Alternative Dispute Resolution In South Korea: A General Overview" explains the litigation culture in Korea as follows:

(Continued ...)

Judge Marrero
Page 4

delay—particularly in complex cases—until regulatory authorities have published the official results of their investigations. *See* Expert Decl., ¶11.

As explained in the Expert Decl., the appropriate triggering date for the statute of limitations in an accounting fraud case was the date that the Financial Supervisory Service announced that accounting fraud had occurred despite the fact that earlier reporting of the facts had been disclosed in a bankruptcy proceeding (Korea Supreme Court, July 10, 2008; 2006 DA 79674). *Id.* In Korea Supreme Court Decision, May 27, 2010; 2010 DA 7577, the Court explained that becoming "practically and specifically aware" of a civil claim for damages under Article 766 occurred on the date that an appellate court decided that the defendant was guilty of embezzlement, despite the fact that the Financial Supervisory Service had previously reported the alleged wrongdoing to the prosecutor's office, that a criminal trial had commenced, and that the plaintiff had previously sued the defendant for a limited amount of damages arising from the same fraudulent conduct. *Id.*, ¶12. The Supreme Court's decision rested, in part, on (1) the fact that even though the plaintiff knew that the defendant had been criminally charged, it would be reasonable for the plaintiff to bring the claim for expanded damages only after criminal guilt was established, and (2) a concern that a rush to litigation would expose the plaintiff to additional and unnecessary filing fees and legal costs if the defendant was found not guilty. *Id.* In another Korean Supreme Court decision involving financial misconduct, Korean Supreme Court Decision, January 18, 2008; 2005 DA 65579, the court found that publicly released findings of the Financial Supervisory Commission and the Financial Supervisory Service did not start the statute of limitations period when the reports did not provide all of the material facts needed to "practically" bring a claim. *Id.*, ¶13.

In other contexts, the Korean Supreme Court has shown a reluctance to prematurely start the statute of limitations. For example, in Supreme Court Decision, July 24, 1998; 97Meu118, the Court found that a putative spouse had not "become aware" that her relationship had broken down even though her partner had left her and moved in with another woman. It was only after a court had ruled against her on the validity of her purported marriage to her former partner that the statute started running. *Id.*, ¶14. And in a May 24, 2012 decision (2009 DA 22549), the Korean Supreme Court held that the statute of limitations had not run on claims by Korean citizens enslaved by Japanese companies during World War II because it was not clear whether a 1965 agreement between Japan and Korea barred their claims. *Id.*, ¶15. In its May 24, 2012, decision, the Supreme Court introduced a further important factor into the statute of limitation analysis—the concept of laches. In that case the Court noted that there was no showing of prejudice to the defendant in litigating the dispute on the merits. *Id.*

Thus, under Korean law, the Court must consider the overall practicalities of filing a claim, with due regard for the cultural and procedural traditions implicated by that sovereign's law. The

---

(... Continued)

The Koreans therefore, have a traditional tendency to avoid legal sanctions as a means of settling private disputes. Conflicts are customarily solved by discussion and settlement rather than by litigation within the framework of Korea's judicial system. Koreans give priority to maintaining harmonious human relations. In even in the context of today's contemporary legal system, the Korean attitude towards litigation and the behavior of Korean participants in a legal dispute is often guided by Confucian ethics. The traditional affinity for settling disputes amicably or avoiding them altogether continues to persist.

*See* http://www.leeko.com/CHIN/pdf/Article_THL_8.pdf.

court must also weigh any prejudice caused to the defendant by the delay. The burden of establishing that the statute of limitations has expired rests squarely on the defendant. *Id.*, ¶16. Here, as in the Korean Supreme Court decisions summarized above, the *regulatory findings* by the FCIC detailing the specifics of Merrill-Lynch's fraud, bolstered by evidence supporting these conclusions, is the reasonable date from which to measure whether a Korean plaintiff could "practically" file a claim for damages in a Korean court. Defendants have entirely failed to carry their burden of establishing a contrary result. *See also* Expert Decl. ¶¶17-24.

Even assuming that U.S. notions of "inquiry notice" merit some consideration here, Defendants' proffer does not clear the bar required for dismissal as a matter of law. In *Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-CIV-2516, 2012 WL 3245500 (S.D.N.Y. Aug. 6, 2012) (Marrero, J) the Court recently summarized the test for establishing inquiry notice:

> As a general matter, the question of whether specific media reports serve to put a diligent plaintiff on inquiry notice involves an objective inquiry into whether the totality of the circumstances revealed probable—and not merely possible-illegal activity attributable to the defendants named in the complaint and of the type described therein. *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir.2008) (describing inquiry notice in context of securities fraud action). "Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." *Id.* (citation omitted).

*Id.* at *7; *see also Merck & Co., v. Reynolds*, 130 S. Ct. 1784, 98 (2010) ("[A] reasonably diligent investigation ... may consume as little as a few days or as much as a few years to get to the bottom of the matter" (quoting *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir 2002)); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005) ("Furthermore, where (as here) plaintiffs' allegations rely on internal communications that (arguably) could not be discovered absent a government-initiated investigation, we will not 'punish [a] pleader for waiting until the appropriate factual information [has been] gathered by dismissing the complaint as time-barred.'").

The documents proffered by Defendants in support of their letter brief—many from obscure blogs and filings contained in the dockets of state courts scattered throughout the United States—demonstrate that slack mortgage lending standards caused an undisputed financial crisis, but nothing in these documents provides the type of specific, credible evidence that would "clearly demonstrate" that Defendants, themselves, were engaged in a fraud perpetrated on Plaintiff. An appendix specifically addressing each of the documents proffered by Defendants follows.[6]

### Conclusion

For the reasons as set forth in this letter, the appendix, the Lebsock Decl., the Kim Decl. and the Expert Decl., Defendants' motion for dismissal based on the statute of limitations must be denied.

SO ORDERED. The Clerk of Court is directed to enter the letter above submitted by plaintiffs in this matter.

10-5-12
DATE   VICTOR MARRERO, U.S.D.J.

cc: All Counsel w/ enclosures

By: HAUSFELD LLP
/s/ Christopher L. Lebsock
Christopher L. Lebsock, *Attorneys for Plaintiff*

---

[6] Every one of the documents cited in the Hakki Declaration was written in English and there is no indication that any of these documents was published in Korean, or even widely-distributed in Korea.