

**HAUSFELD** LLP

415.633.1908 ph
415.358.4980 fax

44 Montgomery Street
Suite 3400
San Francisco, CA 94104

October 3, 2012

**VIA OVERNIGHT DELIVERY**                    **ORAL ARGUMENT REQUESTED**

Hon. Victor Marrero
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Suite 660
New York, New York 10007





CHAMBERS OF
JUDGE MARRERO

RE:  ***Woori Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.,***
S.D.N.Y. Case No. 12 CIV 3993 (VM) (FM)

Dear Judge Marrero:                                        ORIGINAL

    We write on behalf of Plaintiff in response to the letter brief submitted on September 20, 2012 by Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch International, Inc., Merrill Lynch & Co. and Bank of America Corporation (collectively "Defendants").[1] Defendants seek to have Plaintiff's case dismissed on the grounds that the Korean statute of limitations applies the relevant limitations rule, and that the Korean limitations period has expired.  Defendants are wrong on both counts.

**Background**

    Plaintiff filed a complaint against Defendants (Dkt. 1) on May 18, 2012 alleging causes of action sounding in fraud, negligent misrepresentation, and unjust enrichment arising from the sale of collateralized debt obligation ("CDO") notes to Plaintiff.  Plaintiff alleges that it thought that it was purchasing a safe long-term investment that paid a moderate interest rate, with low risk. In reality, recent disclosures by the Financial Crisis Inquiry Commission ("FCIC"), a commission that was created for the *purpose* of "examin[ing] the causes of the current financial and economic crisis in the United States, specifically the role of . . . fraud and abuse in the financial sector"[2], established that Defendants were engaged in fraudulent and deceptive conduct with respect to the structuring and sale of CDOs. *See* Compl. ¶81. The massive fraud disclosed by the FCIC in its report, which was released

---

[1] Taberna Preferred Funding VI, Inc. joins in Defendants' motion.

[2] The FCIC was created by section 5 of the Fraud Enforcement and Recovery Act of 2009 ("Public Law 111-21"), which was signed into law on May 20, 2009. Public Law 111-21(5)(c)(1) directed the FCIC "[t]o examine the causes of the current financial and economic crisis in the United States", including: "(A) fraud and abuse in the financial sector"; "(H) credit rating agencies in the financial system, including reliance on credit ratings by financial institutions and federal financial regulators, the use of credit ratings in financial regulation, and the use of credit ratings in the securitization markets"; "(P) derivatives and unregulated financial products and practices, including credit default swaps"; "(R) financial-institution reliance on numerical models, including risk models and credit ratings"; and "(V) the quality of due diligence undertaken by financial institutions." Public Law 111-21(5)(d)(1) and (d)(2) authorized the Commission to "hold hearings, sit and act at times and places, take testimony, receive evidence, and administer oaths" and "require, by subpoena or otherwise, the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, and documents." *See* http://www.gpo.gov/fdsys/pkg/PLAW-111publ21/html/PLAW-111publ21.htm.

Judge Marrero
Page 2

on January 27, 2011, provided specific and detailed evidence that Defendants knew that the ratings assigned to the CDOs were false when made (Compl. ¶¶78-80; 84-91) and that the CDOs were built upon massive amounts of defective mortgages that had been waived into the securitization pools (Compl. ¶75). The FCIC supported its findings with specific testimony taken from key participants in the industry and the report carried the imprimatur of credibility from the U.S. government.

### Plaintiff's Claims Are Timely Under New York Law

At the August 9 case management conference, the parties discussed (and the Court ordered) a streamlined approach to Rule 12 briefing in which the first issue to be briefed would be the proper construction and application of the Korean statute of limitations. However, subsequ⋯  developments have established that New York's borrowing statute does *not* apply here, and accord⋯  ⋯ York, not Korea, supplies the relevant statute of limitations. In the interests of expediency a⋯  ⋯cial economy, Plaintiff briefs its argument on this threshold issue before turning to an anal⋯⋯ ⋯f the Korean statute of limitations.

New York's borrowing statute, N.Y. CPLR §202, provides as follows:

> An action based upon a cause of action accruing without the state canno⁺ ¹
> after the expiration of the time limited by the laws of either the state c⋯        ⋯ ⋯ ⋯out
> the state where the cause of action accrued, except that where the cau⋯  ⋯ction accrued
> in favor of a resident of the state the time limited by the laws of the sta⋯ ⋯ shall apply.

In *Antone v. General Motors Corp.*, 473 N.E.2d 742, 484 N.Y.S.2d 514 (1984) ("*Ant⋯ ⋯ ⋯*) the Court of Appeals explained: "We thus hold that "resident" as used in CPLR 202 does not have the same meaning as "domiciliary". Rather, the determination of whether a plaintiff is a New York resident, for purposes of CPLR 202, turns on whether he has a significant connection with some locality in the State . . . ." *Id.* at 746; 518. *See also id.* at 745; 517 ("New York has long recognized that 'residence' and 'domicile' are not interchangeable. In 1908 this court noted that the two t⋯ ⋯ s are not identical, recognizing, for example, that while a person can have but one domicile he c⋯⋯ have more than one residence."). Here, it is clear that Plaintiff is a resident of New York. It maintains an office in Manhattan, has more than two-dozen employees in the state, pays taxes to the state, is chartered and regulated by the New York Banking Department, and otherwise conducts substantial business here on a *daily* basis. *See* Declaration of Manho Kim ("Kim Decl."). Plaintiff's presence in New York subjects it to the full panoply of the state's regulatory and legal regime—both the burdens *and the benefits*—such that it can fairly be said to have "a significant connection with some locality in the State."[3]

Accordingly, application of New York's statute of limitations applies and Plaintiff's claims are timely. For example, N.Y. CPLR §213(8) provides that "an action based upon fraud; the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." *See also Reilly Green Mountain Platform Tennis v. Cortese*, 28 Misc.3d 1234(A), 2007 WL 7263362, *10 (N.Y.

---

[3] Defendants will undoubtedly oppose this argument on the grounds that Plaintiff does not maintain its principal place of business in New York and will cite a number of non-binding authorities in support of its position. Most of these cases pre-date the expansive language of *Antone*, or do not consider it, and none provides the type of comprehensive evidence of presence in the state shown by Plaintiff here.

Judge Marrero
Page 3

Sup. Nov. 14, 2007); *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F.Supp.2d 41, 62-63 (E.D.N.Y. 2011) (§213 applies to negligent misrepresentation claims sounding in fraud); *Cohen v. Cohen*, 773 F.Supp.2d 373, 396-97 (S.D.N.Y. 2011) (6 year limitations period applies to unjust enrichment claim).

## Plaintiff's Claims Are Not Barred By Korean Law

Even assuming that Korean law provides the relevant statute of limitations, Plaintiff's claims are timely.  Korea Civil Act, Article 766 (Prescription In Respect Of Right To Claim for Damages) ("Article 766") provides as follows:

> (1) The right to claim for damages resulting from an unlawful act shall lapse by prescription if not exercised within three years commencing from the date on which the injured party or his agent by law becomes aware of such damage and of the identity of the person who caused it.
> (2) The provisions of paragraph (1) shall also apply if ten years have elapsed from the time when the unlawful act was committed.

The parties agree that the three-year limitations period under Article 766(1) begins to run when the injured party becomes practically and specifically aware of the facts constituting the elements of its claims, i.e., the fact that damages were incurred, the existence of unlawful act(s), and a substantial causal relationship between such unlawful act(s) and damages. While it is not necessary for the injured party to have specific knowledge of the exact degree and amount of damages, when such injured party is deemed to have had practical and specific awareness as to the elements of its claims should be reasonably determined based on the circumstances under which the claim for damages became possible from a practical perspective, taking into account the totality of the objective evidence in each case.

Defendants suggest that this standard is identical to New York's inquiry notice standard and that the Court can look to New York decisional law to resolve their motion. But the laws of Korea and New York are not interpreted in the same way, and this Court may not apply New York's inquiry notice standards here. As demonstrated by the Declaration of the Honorable Suk-Soo Kim and Si Yoon Lee[4] in Opposition to Defendants' Motion to Dismiss the Complaint ("Expert Decl."), the Korean Supreme Court applies its three year statute of limitations in a manner that provides significant deference to the "practical ability" of a plaintiff to bring a claim. This material qualifying consideration requires an analysis of facts and circumstances not necessarily considered in an inquiry notice analysis under U.S. law. For example, due to fundamental differences in culture and legal procedure between Korea and the United States, the Korean Supreme Court has routinely ignored "facts" that might provide inquiry notice under U.S. precedent. Unlike the litigation culture in the U.S., where claimants often sue first and ask questions later, Korea's Supreme Court decisions reflect a cultural preference for delaying litigation until all of the relevant facts have been gathered and considered.[5] And because there is no equivalent right to discovery in Korea, this frequently requires a

---

[4] The Honorable Suk-Soo Kim is a former justice of the Supreme Court of Korea.  He is the former Prime Minister of that country and has held numerous other prominent positions in Korea during his career.  *See* Expert Decl., pp. 2-3.  The Honorable Si-Yoon Lee is a recognized expert in Korean civil procedure and has served as a judge on the Constitutional Court of Korea. He has been appointed as the presiding judge in numerous district courts throughout Korea during his career and has served as chairman of numerous committees concerning the development of civil procedure in Korea.  He is a former law school dean. *See* Expert Decl., pp. 3-4.
[5] An article authored by Tae Hee Lee, Esq., a senior partner at one of Korea's premier law firms, Lee & Ko, titled "Alternative Dispute Resolution In South Korea: A General Overview" explains the litigation culture in Korea as follows:

(Continued ...)

Judge Marrero
Page 4

delay—particularly in complex cases—until regulatory authorities have published the official results of their investigations. *See* Expert Decl., ¶11.

As explained in the Expert Decl., the appropriate triggering date for the statute of limitations in an accounting fraud case was the date that the Financial Supervisory Service announced that accounting fraud had occurred despite the fact that earlier reporting of the facts had been disclosed in a bankruptcy proceeding (Korea Supreme Court, July 10, 2008; 2006 DA 79674). *Id.* In Korea Supreme Court Decision, May 27, 2010; 2010 DA 7577, the Court explained that becoming "practically and specifically aware" of a civil claim for damages under Article 766 occurred on the date that an appellate court decided that the defendant was guilty of embezzlement, despite the fact that the Financial Supervisory Service had previously reported the alleged wrongdoing to the prosecutor's office, that a criminal trial had commenced, and that the plaintiff had previously sued the defendant for a limited amount of damages arising from the same fraudulent conduct. *Id.*, ¶12. The Supreme Court's decision rested, in part, on (1) the fact that even though the plaintiff knew that the defendant had been criminally charged, it would be reasonable for the plaintiff to bring the claim for expanded damages only after criminal guilt was established, and (2) a concern that a rush to litigation would expose the plaintiff to additional and unnecessary filing fees and legal costs if the defendant was found not guilty. *Id.* In another Korean Supreme Court decision involving financial misconduct, Korean Supreme Court Decision, January 18, 2008; 2005 DA 65579, the court found that publicly released findings of the Financial Supervisory Commission and the Financial Supervisory Service did not start the statute of limitations period when the reports did not provide all of the material facts needed to "practically" bring a claim. *Id.*, ¶13.

In other contexts, the Korean Supreme Court has shown a reluctance to prematurely start the statute of limitations. For example, in Supreme Court Decision, July 24, 1998; 97Meu18, the Court found that a putative spouse had not "become aware" that her relationship had broken down even though her partner had left her and moved in with another woman. It was only after a court had ruled against her on the validity of her purported marriage to her former partner that the statute started running. *Id.*, ¶14. And in a May 24, 2012 decision (2009 DA 22549), the Korean Supreme Court held that the statute of limitations had not run on claims by Korean citizens enslaved by Japanese companies during World War II because it was not clear whether a 1965 agreement between Japan and Korea barred their claims. *Id.*, ¶15. In its May 24, 2012, decision, the Supreme Court introduced a further important factor into the statute of limitation analysis—the concept of laches. In that case the Court noted that there was no showing of prejudice to the defendant in litigating the dispute on the merits. *Id.*

Thus, under Korean law, the Court must consider the overall practicalities of filing a claim, with due regard for the cultural and procedural traditions implicated by that sovereign's law. The

---

(... Continued)

The Koreans therefore, have a traditional tendency to avoid legal sanctions as a means of settling private disputes. Conflicts are customarily solved by discussion and settlement rather than by litigation within the framework of Korea's judicial system. Koreans give priority to maintaining harmonious human relations. In even in the context of today's contemporary legal system, the Korean attitude towards litigation and the behavior of Korean participants in a legal dispute is often guided by Confucian ethics. The traditional affinity for settling disputes amicably or avoiding them altogether continues to persist.

*See* http://www.leeko.com/CHIN/pdf/Article_THL_8.pdf.

Judge Marrero
Page 5

court must also weigh any prejudice caused to the defendant by the delay. The burden of establishing that the statute of limitations has expired rests squarely on the defendant. *Id.*, ¶16. Here, as in the Korean Supreme Court decisions summarized above, the *regulatory findings* by the FCIC detailing the specifics of Merrill-Lynch's fraud, bolstered by evidence supporting these conclusions, is the reasonable date from which to measure whether a Korean plaintiff could "practically" file a claim for damages in a Korean court. Defendants have entirely failed to carry their burden of establishing a contrary result. *See also* Expert Decl. ¶¶17-24.

Even assuming that U.S. notions of "inquiry notice" merit some consideration here, Defendants' proffer does not clear the bar required for dismissal as a matter of law. In *Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-CIV-2516, 2012 WL 3245500 (S.D.N.Y. Aug. 6, 2012) (Marrero, J) the Court recently summarized the test for establishing inquiry notice:

> As a general matter, the question of whether specific media reports serve to put a diligent plaintiff on inquiry notice involves an objective inquiry into whether the totality of the circumstances revealed probable—and not merely possible-illegal activity attributable to the defendants named in the complaint and of the type described therein. *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir.2008) (describing inquiry notice in context of securities fraud action). "Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." *Id.* (citation omitted).

*Id.* at *7; *see also Merck & Co., v. Reynolds*, 130 S. Ct. 1784, 98 (2010) ("[A] reasonably diligent investigation ... may consume as little as a few days or as much as a few years to get to the bottom of the matter" (quoting *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir 2002)); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005) ("Furthermore, where (as here) plaintiffs' allegations rely on internal communications that (arguably) could not be discovered absent a government-initiated investigation, we will not 'punish [a] pleader for waiting until the appropriate factual information [has been] gathered by dismissing the complaint as time-barred.'").

The documents proffered by Defendants in support of their letter brief—many from obscure blogs and filings contained in the dockets of state courts scattered throughout the United States—demonstrate that slack mortgage lending standards caused an undisputed financial crisis, but nothing in these documents provides the type of specific, credible evidence that would "clearly demonstrate" that Defendants, themselves, were engaged in a fraud perpetrated on Plaintiff. An appendix specifically addressing each of the documents proffered by Defendants follows.[6]

### Conclusion

For the reasons as set forth in this letter, the appendix, the Lebsock Decl., the Kim Decl. and the Expert Decl., Defendants' motion for dismissal based on the statute of limitations must be denied.

SO ORDERED. *The Clerk of Court is directed to enter the letter above submitted by plaintiffs in this matter*

10-5-12
DATE          VICTOR MARRERO, U.S.D.J.
cc:    All Counsel w/ enclosures

By:  HAUSFELD LLP

    */s/ Christopher L. Lebsock*
    Christopher L. Lebsock, *Attorneys for Plaintiff*

---

[6] Every one of the documents cited in the Hakki Declaration was written in English and there is no indication that any of these documents was published in Korean, or even widely-distributed in Korea.

*Woori Bank v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.*
S.D.N.Y. Case No. 12-CV-3993 (VM) (FM)

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 1 | Nov. 12, 2006 | Business week | *Mortgage Lenders Feel the Chill* | "There have been a lot of underwriting abuses in this industry, and it's gotten worse as competition has heated up for lower and lower volumes. These companies have a lot of issues." | The article does not mention Merrill Lynch. *Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *10 (S.D.N.Y. Aug. 6, 2012) ("The suggestion of probable claims necessary to trigger inquiry notice must . . . be defendant-specific . . .")". |
| 2 | Dec. 5, 2006 | The Wall Street Journal | *More Borrowers with Risky Loans are Falling Behind* | "Fraud has also increased. Some borrowers who took out no- or low-documentation loans were coached by loan officers or mortgage brokers to inflate their incomes and couldn't afford even their first mortgage payment." | The article does not mention Merrill Lynch. |
| 3 | Dec. 7, 2006 | Bloomberg Law | *Ownit Mortgage, Part-Owned by Merrill, Shuts Down This Week* | "The Los Angeles Times today reported that Ownit ran out of cash needed to meet obligations. The newspaper said Ownit issued a statement blaming New York-based Merrill for cutting off its funding." | The article attributes Ownit's failure not to any fraud but to Merrill Lynch's decision to stop funding it. *CSAM Capital, Inc. v. Lauder*, 67 A.D. 3d 149, 156 (1st Dep't. 2009) ("[T]he fact the . . . letter contained non-fraudulent explanations for the fund's actions suggests that reasonable diligence would not have revealed any evidence of fraud . . . at that time."). |
| 4 | Dec. 16, 2006 | The Economist | *Subprime Subsidence* | "The lenders compounded their problems greatly by loosening their underwriting standards in a further attempt to keep business chugging along. Sometimes these | This article negates an inference of fraud, identifying Merrill Lynch after a statement that "the big banks have started scrutinizing loans offered up for securitization far more closely—and are throwing far more than they used to back at the subprime lenders." |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 5 | Jan. 26, 2007 | The New York Times | *Tremors at the Door* | "[Statistics] also indicate that mortgage lenders became more generous last year, giving 100 percent financing and allowing borrowers to state their incomes with little or no documentation in an effort to bolster volume, according to industry experts." | The article does not attribute the low and no-documentation loan practices to Merrill Lynch but to "Wall Street". |
|  |  |  |  | "Wall Street firms were attracted to such lenders because they helped feed a pipeline of securities backed by the mortgages, a market bigger than the one for United States Treasury bonds and notes. Merrill Lynch, for example, securitized $67.8 billion in residential mortgages in the first nine months of 2006, up 584 percent from the period a year earlier." | Moreover, the article indicates that "banks have sought the safety of . . . protective measures [like mortgage buybacks] and grown pickier about the kinds of loans they will buy." *See CSAM Capital, Inc. v. Lauder*, 67 A.D. 3d 149, 156 (1st Dep't 2009). |
|  |  |  |  | " . . . Regulators . . . have stepped up warnings about slack lending standards." |  |
|  |  |  |  | were waived altogether." |  |
|  |  |  |  | "For his part, Mr. Dallas acknowledges that standards were lowered, but he placed the blame |  |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 6 | Feb. 15, 2007 | The Economist | Bleak Houses | " ... Financial engineers worked their mysterious magic with these securities, turning the junkiest mortgages into high-grade, sometimes AAA-rated, securities. They could do this only with the blessing of credit-ratings agencies, which made profitable business out of rating these securities. But critics say the agencies got complacent, and doubt the pooled loans were sufficiently diverse, or sliced up with sufficient art truly to have dispersed risk ... " | The article never refers to Merrill Lynch and does not identify fraud, but expresses the "doubt" of critics toward rating agencies' practices. Being on notice of "generalized problems" is not adequate to create inquiry notice. *See In re Bayou Group*, 439 B.R. 284, 322 (S.D.N.Y. 2010) ("While the Westervelt complaint might be read as indicating 'some problem with Bayou or its top management,' . . . that is not the appropriate standard for determining whether a [party] is on inquiry notice.") |
| 7 | Feb. 18, 2007 | The New York Times | Will Other Mortgage Dominoes Fall? | at the feet of investors and Wall Street, saying they encouraged Ownit and other subprime lenders to make riskier loans to keep the pipeline of mortgage securities well supplied." "Relying on rating agencies to analyze the risk in collateralized debt obligations may be unwise, however. Back in May 2005, Alan Greenspan noted the complexity of collateralized debt obligations and the challenges they pose to 'even the most sophisticated market participants.' He warned investors not to rely. | The article does not mention Merrill Lynch. Nor does the article disclose the fact that Merrill was actively working to subvert the credit rating process. *See In re Bayou Group*, 439 B.R. 284, 322 (S.D.N.Y. 2010) ("While the Westervelt complaint might be read as indicating 'some problem with Bayou or its top management,' . . . that is not the appropriate standard for determining whether a [party] is on inquiry notice.") |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| | | | | solely on rating agencies to identify the risks in these securities." | |
| 8 | Mar. 5, 2007 | The New York Times | *A Mortgage Crisis Begins to Spiral, and the Casualties Mount* | "Investors and regulators fear that the problems will only worsen as so many borrowers have fallen behind so quickly, especially at a time when the overall economy is healthy. The phenomenon suggests that lending standards were significantly weakened last year and that lenders were not as watchful for fraudulent transactions." | The article identifies an industry-wide problem and potential conflict. This is insufficient basis to find inquiry notice. *See Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 170 (2d Cir. 2005) ("Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud—let alone furnish a basis sufficiently particular to support a fraud complaint. Nor does the existence of temptation trigger a duty of inquiry—at least, not by a reasonable investor. Something more than conflicted interest is required, no matter how well publicized the conflict may be."). *In re Bayou Group,* 439 B.R. 284, 322 (S.D.N.Y. 2010) ("While the Westervelt complaint might be read as indicating 'some problem with Bayou or its top management,' . . . that is not the appropriate standard for determining whether a [party] is on inquiry notice.") |
| 9 | Mar. 11, 2007 | The New York Times | *Crisis Looms in Market for Mortgages* | "Looking to expand their reach and their profits, lenders were far too willing to lend, as evidenced by the creation of new types of mortgages ... that required little or no down payment and little or no documentation of a borrower's income. Loans with 40-year or even 50-year terms were also popular among cash-strapped borrowers seeking low monthly payments. Exceedingly low | Article discusses "lenders" generally and not Merrill Lynch, who was an underwriter in any event. *See Federal Housing Finance Agency v. UBS Americas, Inc.,* No. 11-cv-5201, 2012 WL 1570856, at *9 (S.D.N.Y. May 4, 2012) ("[Plaintiff]'s claim here is not that the *originators* failed to scrutinize loan applicants adequately *in general*; it is that *defendants* failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the *particular* securitizations |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 10 | Mar. 13, 2007 | Bloomberg | *CDOs May Bring Subprime-like Bust for LBOs, Junk Debt* | 'teaser' rates that move up rapidly in later years were another feature of the new loans.... Mortgages requiring little or no documentation became known colloquially as 'liar loans.'" <br><br> "Individuals with poor credit histories who borrowed for home loans obtained similar easy terms. Many of those subprime loans also have ended up in CDOs." <br><br> "The lenders lower their standards and say 'Well, we can put them into CDOs.' Like that's somehow burying that it's toxic waste." | sold to the [Plaintiff]." (emphasis in original). <br><br> The article does not mention Merrill Lynch. <br><br> The article does not discuss manipulation of credit ratings by *any* banks, let alone by Merrill Lynch, or the waiver of *defective* mortgages into the securitization pools. It merely discusses that subprime loans turn up in CDOs. This is not the basis of the fraud alleged by Plaintiff. |
| 11 | Mar. 22, 2007 | The Economist | *Cracks in the Facade* | "Casey Serin knows all about the excesses of America's housing bubble. In 2006 the 24-year old web designer from Sacramento bought seven houses in five months. He lied about his income on 'no document' loans and was not asked for anything so old-fashioned as a deposit." <br><br> "When the housing market began to slow, lenders pepped up the pace of sales that violated basic underwriting by dramatically | The article discusses "lenders" generally. *Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *10 (S.D.N.Y. Aug. 6, 2012) ("The suggestion of probable claims necessary to trigger inquiry notice must . . . be defendant-specific. . . ."). |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 12 | May 8, 2007 | The New York Times | *East Coast Money Lent Out West* | "loosening credit standards...." <br><br> "Pressure is mounting to right the wrongs- real and perceived. Attorneys-general from New York to California have started to investigate fraudulent mortgage lending." <br><br> "Lenders in California say big investment banks encouraged and pushed them to make risky loans. On Wall Street, bank executives say mortgage lenders became sloppy and did not pay enough attention to fraud. Whatever the cause, Ownit provides a vivid example of what went wrong." <br><br> "William D. Dallas, the founder and chief executive of Ownit, acknowledges loosening lending standards but says he did so reluctantly and under pressure from his investors, particularly Merrill Lynch, which wanted more loans to package into lucrative securities." <br><br> "The popularity of stated-income loans, derisively referred to as 'liar's loans' by critics, seemed | *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 170 (2d Cir. 2005) ("Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud-let alone furnish a basis sufficiently particular to support a fraud complaint. Nor does the existence of temptation trigger a duty of inquiry-at least, not by a reasonable investor. Something more than conflicted interest is required, no matter how well publicized the conflict may be."); *In re Bayou Group*, 439 B.R. 284, 322 (S.D.N.Y. 2010) ("While the Westervelt complaint might be read as indicating 'some problem with Bayou or its top management,' . . . that is not the appropriate standard for determining whether a [party] is on inquiry notice.") |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 13 | May 16, 2007 | Financial Times | *Failing Grades?* | "How these ratings are decided upon is the subject of growing anxiety, with concerns hinging on the relationships between the agencies and big investment banks on Wall Street and in the City of London. Some worry about the potential for conflicts of interest, given that investment banks rather than investors pay for ratings." | Conflicts of interest or "potential" for conflicts of interest are not adequate to create a duty of inquiry notice. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 170 (2d Cir. 2005) ("Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud-let alone furnish a basis sufficiently particular to support a fraud complaint. Nor does the existence of temptation trigger a duty of inquiry-at least, not by a reasonable investor. Something more than conflicted interest is required, no matter how well publicized the conflict may be.") |
| 14 | May 31, 2007 | Bloomberg News | *CDO Boom Masks Subprime Losses, Abetted by S&P, Moody's* | "The potential for conflicts of interest in the agencies' 'issuer pays' model has drawn fire before, but the scale of their dependence on investment banks for the structured finance business gives them a significant incentive to look kindly on the products they are rating, critics say". | Conflicts of interest or "potential" for conflicts of interest are not adequate to create a duty of inquiry notice. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 170 (2d Cir. 2005) ("Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud-let alone furnish a basis sufficiently particular to support a fraud complaint. . . . Something |
|  |  |  |  | "Credit raters participate in every level of packaging a CDO' ... 'The rating companies tell CDO assemblers how to squeeze the most profit out of the CDO by maximizing the size of the tranches with the highest ratings,' |  |



| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 15 | Aug. 13, 2007 | Portfolio.com | *Fitch* | he says." <br><br> "It's important to understand that unlike in the corporate bond market, in the securitization market, the rating agencies run the show,' he says. 'This is not a passive process of rating corporate debt. This is a financial engineering ratings provided by the ratings business.'" | more than conflicted interest is required, no matter how well publicized the conflict may be.'") <br><br> The article was apparently never published in a general source that Woori was likely to encounter. *See Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *11 (S.D.N.Y. Aug. 6, 2012) (noting that the Court "cannot conclude' that a reasonable . . . plaintiff 'would have encountered th[is] article'" with respect to articles prepared by a law firm and *The Kansas City Star.*)(quoting *Staehr v. the Hartford Fin. Srvs. Group*, 547 F.3d 406, 434 (2d Cir. 2008)). |
|  |  |  | *Overrated, The Subprime Mortgage Market Could – Finally – End the Credit Ratings Racket* | "Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets." <br><br> "The slides detailed an 'iterative process, giving feedback to underwriters before bonds are even issued. They laid out how Moody's and its peers help their clients put together complicated mortgage securities before they receive an official ratings stamp." | Moreover, the article never mentions Merrill Lynch. *Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *10 (S.D.N.Y. Aug. 6, 2012) ("The suggestion of probable claims necessary to trigger inquiry notice must . . . be defendant-specific . . ."). <br><br> Specialty publications do not provide sufficient notice to "an investor of ordinary intelligence." *Staehr v. the* |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 16 | Sept. 7, 2007 | The Wall Street Journal | *Ratings Firms' Practices Get Rated* | "The Securities and Exchange Commission and state attorneys general in New York and Ohio have begun to examine how the ratings firms evaluated subprime-mortgage-backed securities that grew into a trillion-dollar market."<br><br>"Critics point out that ratings firms' financial fortunes are closely tied to the volume of securities deals - and that higher ratings often spur deals on by making securities easier to sell." | *Hartford Fin. Srvs. Group*, 547 F.3d 406, 432 (2d Cir. 2008).<br><br>The article is about investigations into *ratings firms*, not Merrill Lynch. *Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *10 (S.D.N.Y. Aug. 6, 2012) ("The suggestion of probable claims necessary to trigger inquiry notice must . . . be defendant-specific. . . ."). The potential for conflict of interest because of the ratings agencies does not create inquiry notice. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 170 (2d Cir. 2005) ("Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud-let alone furnish a basis sufficiently particular to support a fraud complaint. . . . Something more than conflicted interest is required, no matter how well publicized the conflict may be.") |
| 17 | Oct. 9, 2007 | Financial Times | *Reputations to restore at unforgiving Merrill* | "Last week came the shock news that Merrill would have to write off $5bn in the third quarter after being wrongfooted by the credit squeeze. The hit was the worst so far for any bank . . . The $4.5bn of writedowns in its collateralised debt obligations business - which packages subprime mortgages for sale to investors - were particularly brutal."<br><br>"They say that, in spite of warnings from senior executives, | Losses are insufficient to create inquiry notice. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2005 WL 2148919, at *9 (S.D.N.Y. Sept. 6, 2005) ("[P]oor performance alone is not an indication of securities fraud."). Moreover, the article identifies numerous non-fraudulent explanations for Merrill's huge losses, including (1) market explanations ("[e]xecutives . . . buying and packaging subprime loans long after investor appetite had dried up."); (2) mis-management explanations ("[o]ne former executive claims that Mr. O'Neal places too high a value on personal loyalty [sic] and that this sometimes means he puts the wrong people in key jobs."). These explanations would, if anything, |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 18 | Oct. 18, 2007 | | *MetroPCS Commc'ns v. Merrill Lynch & Co., Inc.,* Cause No. 07-12430 (Dallas Cty., Tex. Dist. Ct.) | expansion into CDOs got out of control." | **negate** an inference of fraud. *See Newman v. Warnaco Grp., Inc.,* 335 F.3d 187, 194 (2d Cir. 2003) ("It was reasonable for Plaintiffs not to inquire into Warnaco's statements because Warnaco had provided [a] seemingly benign explanation.") *CSAM Capital, Inc. v. Lauder,* 67 A.D. 3d 149, 156 (1st Dep't. 2009) ("[T]he fact the . . . letter contained non-fraudulent explanations for the fund's actions suggests that reasonable diligence would not have revealed any evidence of fraud . . . at that time."). |
| | | | | Complaint asserting fraud and negligent misrepresentation claims in connection with plaintiffs purchase of auction rate securities ("ARS") in the form of second priority senior tranches of CDOs, including Manloloking, alleging that "Merrill deliberately failed to disclose the high-risk nature of the CDOs and its conflicts of interests to MetroPCS. ... In addition, as the underwriters of the CDOs, Merrill wanted to shift these into MetroPCS's account." ¶ 42. | The Complaint addresses Merrill's conduct as MetroPCS Communications' *financial advisor.* It does not make allegations about the fraud alleged in the Woori complaint.

While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.,* MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). |
| | | | | "Merrill also failed to disclose to MetroPCS its significant conflicts of interest in urging MetroPCS to | |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 19 | Oct. 25, 2007 | The Wall Street Journal | *Merrill Takes $8.4 Billion Credit Hit* | invest in CDOs. These conflicts included, among other things, the following: … Merrill held significant positions in the CDOs for its own account, and thus wanted to ensure that the market for such CDOs did not collapse. …" ¶ 50<br><br>"The $8.4 billion hit leaves it clear that Mr. O'Neal and his team didn't always appreciate the risks they took to achieve the greater profits."<br><br>"More than 70% of the securities issued by each CDO bore triple-A credit ratings. Traditionally these top-rated securities were insured by a financial guaranty company, which effectively bore the risk of losses. But by mid-2006, few bond insurers were willing to write protection on CDOs that were ultimately backed by subprime mortgages to people with poor credit histories." | The article highlights that "**Merrill** put large amounts of AAA-rated CDOs onto its own balance sheets thinking they were low-risk assets because of their top credit ratings." The article quotes Merrill's CEO attributing its writedowns to an "unprecedented liquidity squeeze," "worsening market conditions" and a "more conservative valuation" of RMBS, not fraud. These present benign explanations, not red flags creating inquiry notice. *See Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194 (2d Cir. 2003) ("It was reasonable for Plaintiffs not to inquire into Warnaco's statements because Warnaco had provided [a] seemingly benign explanation."); *CS&M Capital, Inc. v. Lauder*, 67 A.D. 3d 149, 156 (1st Dep't. 2009) ("[T]he fact the . . . letter contained non-fraudulent explanations for the fund's actions suggests that reasonable diligence would not have revealed any evidence of fraud . . . at that time.").<br><br>Moreover, losses are insufficient to create inquiry notice. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2005 WL 2148919, at \*9 (S.D.N.Y. Sept. 6, 2005) ("[P]oor performance alone is not an indication of securities |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 20 | Oct. 25, 2007 | The Wall Street Journal | *Pioneer Helped Merrill Move Into CDOs* | "Merrill CEO Stan O'Neal acknowledged that the firm had fumbled the CDO business: The bottom line is, we got it wrong by being overexposed to subprime.' Mr. O'Neal added that Merrill had misjudged the risk of many CDOs. 'It turned out that both our assessment of the potential risk and mitigation strategies were inadequate,' he said."<br><br>"Merrill salespeople scoured the globe for buyers of CDOs, selling pieces of them to a wide range of investors such as Woori Bank ... Among the buyers was a wireless-broadband company in Dallas called MetroPCS Communications Inc. Last week, in District Court of Dallas County, Texas, MetroPCS sued Merrill ... " | The allegation of "misjudging" the risk of CDOs is a benign explanation negating any inference of fraud at this time. *See Newman v. Warnaco Grp. Inc.*, 335 F.3d 187, 194 (2d Cir. 2003) ("It was reasonable for Plaintiffs not to inquire into Warnaco's statements because Warnaco had provided [a] seemingly benign explanation.") *CS&M Capital, Inc. v. Lauder*, 67 A.D. 3d 149, 156 (1st Dep't. 2009) ("[T]he fact the . . . letter contained non-fraudulent explanations for the fund's actions suggests that reasonable diligence would not have revealed any evidence of fraud . . . at that time."). |
| 21 | Oct. 30, 2007– Jan. 9, ... | | | *18* lawsuits filed alleging Merrill misrepresented its exposure to CDOs and subprime mortgages, | While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to |

fraud.").

Nor is there any discussion in this article about Plaintiff or Plaintiff's investments with Merrill Lynch.

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| | 2008 | | | later consolidated into the "Securities Actions," and "Derivative Actions," and "ERISA Actions" in *In re Merrill Lynch & Co., Inc.* 2008 No. 07-cv-09633. *See* Merrill Lynch 10-Q, 11/11/2007; *see also infra* Ex. 36. | impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.*, MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). Moreover, alleged misrepresentation of *Merrill Lynch's* exposure does not shed any light on Defendants' conduct as it relates to Plaintiff's investments. |
| 22 | Nov. 1, 2007 | Dow Jones Int'l News | *Woori 3Q Net Down 46% on CDO Loss, Weakening Margin* | "Woori Bank bought $491 million worth of U.S. CDOs, of which 27% was invested in subprime grade mortgage loans … Woori Bank is 100% owned by Woori Finance. The Wall Street Journal reported last week that Woori Bank was among major clients of Merrill Lynch & Co., which had aggressively expanded in the CDO business." | Losses are insufficient to create inquiry notice. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2005 WL 2148919, at *9 (S.D.N.Y. Sept. 6, 2005) ("[P]oor performance alone is not an indication of securities fraud."). |
| 23 | Nov. 2, 2007 | The Wall Street Journal | *Deals with Hedge Funds May Be Helping Merrill Delay Mortgage Losses* | "Merrill has become ground zero of mortgage problems in the U.S. Last week, the firm announced a $7.9 billion write-down fueled by mortgage-related problems - one of the largest known Wall Street losses in history - after projecting just a few weeks earlier that the write-down would be $4.5 billion." | Losses are insufficient to create inquiry notice. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2005 WL 2148919, at *9 (S.D.N.Y. Sept. 6, 2005) ("[P]oor performance alone is not an indication of securities fraud."). Mere knowledge of an investigation into some aspect of a company's conduct does not create inquiry notice as a matter of law. To trigger inquiry notice, the information must provide "indications of the probability (and not |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| | | | | | just possibility) of the **relevant claims**." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 430 (2d Cir. 2008) (citations omitted and emphasis added). |
| 24 | Nov. 4, 2007 | Business week | *Why Merrill Got Burned So Badly* | "Merrill Lynch & Co. acknowledged that the U.S. Securities and Exchange Commission is investigating its holdings of subprime mortgage debt."<br><br>""The regulatory filing also disclosed that a class-action lawsuit by shareholders and a shareholder-derivative suit were recently filed against the company and several executives, alleging that important information on its collateralized debt obligations wasn't disclosed,' the AP added."<br><br>"Merrill's stunning $7.9 billion third-quarter write-down - the result of a sharp drop in the value of securities backed by risky home loans - is the most painful hit taken by a Wall Street bank during the subprime housing blowout."<br><br>"Merrill took a leadership role in underwriting CDOs in 2006 and 2007, when subprime mortgage lenders all but threw lending | Losses are insufficient to create inquiry notice. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2005 WL 2148919, at *9 (S.D.N.Y. Sept. 6, 2005) ("[P]oor performance alone is not an indication of securities fraud."). Moreover, mere statements that risk controls weakened are inadequate to create inquiry notice. *See Public Emp. Ret. Sys. Of Miss. v. Goldman Sachs Grp., Inc.*, No. 09-cv-1110, 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) (holding that publicly available documents "generally related to the weakening and outright disregard for underwriting guidelines by subprime originators" did not put RMBS plaintiff on notice of its |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 25 | Dec. 6, 2007 | The New York Times | *Wary of Risk, Bankers Sold Shaky Mortgage Debt* | standards out the window .... "We made "a mistake [by having such a large position in CDOs]," O'Neal said in a conference call with analysts. 'Some errors of judgment were made in the business itself and within the risk management function.'" "As the subprime loan crisis deepens, Wall Street firms are increasingly coming under scrutiny for their role in selling risky mortgage-related securities to investors. ... The New York Attorney General, Andrew M. Cuomo, has subpoenaed major Wall Street banks, including ... Merrill Lynch ... seeking information about the packaging and selling of subprime mortgages. ..." | claims). Mere knowledge of an investigation into some aspect of a company's conduct does not create inquiry notice as a matter of law. To trigger inquiry notice, the information must provide "indications of the probability (and not just possibility) of the **relevant claims**." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 430 (2d Cir. 2008) (citations omitted and emphasis added). |
| 26 | Jan. 10, 2008 | | *City of Cleveland v. Deutsche* | "...the loans that many banks packaged are proving to be increasingly toxic. ... About a fifth of the loans backing securities underwritten by Merrill Lynch are in trouble. ..." Complaint by City of Cleveland alleging that Merrill Lynch and other" financial institutions | This litigation involves claims of public nuisance, not fraud and does not discuss CDOs, or Plaintiff's investments in them. While awareness of other suits |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| | | | *Bank Trust Co., et al.,* cv-08-646970 (Cuyahoga Cty., Ohio) | routinely made money available to unqualified borrowers who had no realistic means of keeping up with their loan payments over the long term," and that "securitizers' explicitly countenanced loans made to borrowers either on financially irrational terms or without any information to corroborate the borrowers' wherewithal to pay- anything to keep new mortgages coming for the creation of still more mortgage-backed securities." ¶¶ 1, 8.<br><br>"The investment bankers also provided lenders with lines of credit and other means of financing required to accommodate the dramatic increase in the number of mortgages they were procuring . ... Wall Street necessarily held lenders to generate defective and toxic significant influence over sub-prime lenders [and] used their preeminent status to set the standard that lenders applied to determine who did (almost everyone) and did not (almost no | may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.*, MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 27 | Jan. 12, 2008 | The New York Times | *Inquiry Focuses on Withholding of Data on Loans* | one) qualify for sub-prime financing." ¶¶ 38, 42.<br><br>"An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans. [¶] Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. But the banks did not disclose the details of these reports to credit-rating agencies or investors." ...<br><br>"The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into mortgage investments ... [¶] Connecticut's attorney general, Richard Blumenthal, said his office was conducting a similar review and | General reports of investigation into an entire industry (and do not mention Merrill Lynch) are "simply too meager" to create inquiry notice as to a member of that industry. *See Hinds v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *10 (S.D.N.Y. Aug. 6, 2012). |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 28 | Feb. 2, 2008 | Financia l Times | Regulator Accuses Merrill of Fraud | "A Massachusetts regulator yesterday accused Merrill Lynch of fraud for selling the city of Springfield securities that had been backed by mortgages and other debt instruments that plummeted in value as credit markets fell into turmoil." | The article is wholly unrelated to the allegations in this case. It concerns Merrill's allegedly fraudulent sale of securitized investment products without the express permission of city officials. *See also* Ex. 29. |
| 29 | Feb. 8, 2008 | The Wall Street Journal | Prosecutors Widen Probes Into Subprime – U.S. Attorney's Office Seeks Merrill Material; SEC Upgrades | "The Justice Department's U.S. attorney's office in Manhattan … has notified the Securities and Exchange Commission that it wants to see information the agency is gathering in its investigation of Merrill Lynch & Co. … The SEC is examining, among other things, whether the securities firm booked inflated | Mere knowledge of an investigation into some aspect of a company's conduct does not create inquiry notice as a matter of law. To trigger inquiry notice, the information must provide "indications of the probability (and not just possibility) of the **relevant claims**." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 430 (2d Cir. 2008) (citations omitted and emphasis added). This article, like Ex. 28, discusses only a general investigation into Merrill Lynch and an investigation into fraud related to the unauthorized sale of securitized |

(Above row 28, the following excerpt appears in the Defendants' Excerpt(s) column with no Ex. #, Date, Source, or Title:)

"To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws …. [L]enders and investment banks routinely ignored concerns raised by these consultants."

was cooperating with New York prosecutors. The Securities and Exchange Commission is also investigating."

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
|  |  |  | *Inquiry* | prices of mortgage bonds it held despite knowledge that the valuations had dropped .... [¶] The move by the U.S. attorney's office comes as the SEC has upgraded its Merrill probe to a formal investigation ... " | investment products to Springfield, Massachusetts in connection with Merrill Lynch. |
| 30 | Feb. 25, 2008 |  | Merrill Lynch Form 10-K | Contains disclosures concerning federal securities class actions, ERISA actions, the SEC investigation, and the *City of Cleveland* suit. | The litigation disclosures concern a public nuisance suit and actions against Merrill Lynch alleging that Merrill Lynch made false statements about its own exposure to the credit crisis. No mention of Plaintiff, Plaintiff's investments is set forth in these disclosures.<br><br>While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.*, MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). |
| 31 | Mar. 9, 2008 | The D&O Diary | *A Single "Toxic" CDO, a Multitude of Subprime Lawsuits* | "Metro PCS ... also alleged that Merrill Lynch had undisclosed conflicts of interest, in that it not only underwrote the initial CDO issuance, but continued to act as the sole dealer for the CDO. The company further alleges that Merrill Lynch itself had significant investments in the CDO and therefore had a vested | The article was apparently never published in a general source that Woori was likely to encounter. *See Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *11 (S.D.N.Y. Aug. 6, 2012) (noting that the Court "'cannot conclude' that a reasonable . . . plaintiff 'would have encountered th[is] article,'" with respect to articles prepared by a law firm and *The Kansas City Star*.) |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 32 | Mar. 17, 2008 | Los Angeles Times | *Sub-prime mortgage watchdogs kept on leash* | "Freelance financial watchdogs [from Clayton and Bohan] who examined the paperwork on sub-prime home loans being sold to Wall Street ... say they raised plenty of red flags about flaws so serious that mortgages should have been rejected outright - such as borrowers' incomes that seemed inflated or documents that looked fake - but the problems were glossed over, ignored or stricken from reports." | This article never mentions Merrill Lynch and cannot support inquiry notice. *See Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *10 (S.D.N.Y. Aug, 6, 2012) ("[R]eports – which do not mention . . . Defendants and appear to discuss broadly an ongoing and general investigation into the . . . industry—are similarly 'simply too meager' to hold that Class Plaintiffs should have recognized in them claims against the . . . Defendants."). |
| 33 | Apr. 16, 2008 | The Wall Street Journal | *Merrill Upped Ante as Boom in Mortgage Bonds Fizzled* | "The first tremor that rattled Merrill's profitable business of underwriting mortgage securities came at the end of 2005. As it | Mere statements that risk controls weakened are inadequate to create inquiry notice. *See Public Emp. Ret. Sys. Of Miss. v. Goldman Sachs Grp., Inc.* No. 09-cv-1110, 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, |

(continued to the row above) interest in trying to maintain a market for the CDO securities, as a way to protect its investment."

"Investors in the Mantoloking CDO apparently also included the two now-bankrupt Bear Stearns hedge funds that are the center of so much controversy (and litigation) ... the funds at one time held $135 million of securities issued by the Mantoloking CDO, a CDO-squared . . . "

Case 1:12-cv-03993-VM   Document 46   Filed 10/09/12   Page 26 of 39

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 34 | Apr. 27, 2008 | The New York Times | *Triple-A Failure* | repackaged mortgage bonds into securities called collateralized debt obligations, or CDOs, Merrill had a key partner in insurer American International Group Inc. An AIG unit bore the default risk of the CDOs' largest and highest-rated chunk, known as 'super-senior' tranche, normally sold to big investors such as foreign banks. [¶] ... Concerned that home-lending standards were getting too lax, AIG at the end of 2005 stopped insuring mortgage securities." [¶] "Risk controls at the firm, then run by CEO Stan O'Neal, were beginning to loosen. A senior risk manager, John Breit, was ignored when he objected to certain risks . . . Mr. Breit, then head of market-risk management, told colleagues he had never been overruled like that before' ..." [¶] "For the rating agencies, this business was extremely lucrative. Their profits surged, Moody's in particular. ... saw its earnings grow by 900 percent." | 2011) (holding that publicly available documents "generally related to the weakening and outright disregard for underwriting guidelines by subprime originators" did not put RMBS plaintiff on notice of its claims); *In re Bayou Group*, 439 B.R. 284, 322 (S.D.N.Y. 2010) ("While the Westervelt complaint might be read as indicating 'some problem with Bayou or its top management,' ... that is not the appropriate standard for determining whether a [party] is on inquiry notice."). <br><br> The article does not mention Merrill Lynch. *Hinds County, Miss. v. Wachovia Bank N.A.*, No. 08-Civ-2516, 2012 WL 3245500, at *10 (S.D.N.Y. Aug. 6, 2012) ("The suggestion of probable claims necessary to trigger inquiry notice must ... be defendant-specific ...."). |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 35 | May 16, 2008 | The New York Times | *Color-Blind Merrill in a Sea of Red Flags* | "The challenge to investment banks is to design securities that just meet the rating agencies' tests . … Banks are adroit at working the system, and pools [of MBS] are intentionally designed to include a layer of Baa bonds, or those just over the border. 'Every agency has a model available to bankers that allows them to run the numbers until they get something they like and send it in for a rating,' a former Moody's expert in securitization says. In other words, banks were gaming the system; … 'Gaming is the whole thing.'"<br><br>"Would you invest money—at a very low interest rate—to finance mortgage loans made to risky borrowers who put no money down? What if you knew the company that made most of the loans had gone bankrupt because so many of its loans had turned bad almost immediately? Now, no one would do that. But it was just a year ago that Merrill Lynch was wrapping up a securitization that met just those criteria." | If anything, the article would create inquiry notice with respect to the *ratings agencies*, not Merrill. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 170 (2d Cir. 2005) ("Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud—let alone furnish a basis sufficiently particular to support a fraud complaint. Nor does the existence of temptation trigger a duty of inquiry—at least, not by a reasonable investor. Something more than conflicted interest is required, no matter how well publicized the conflict may be.").<br><br>These generalized allegations are insufficient to create inquiry notice. *See Public Emp. Ret. Sys. Of Miss. v. Goldman Sachs Grp., Inc.*, No. 09-cv-1110, 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) (holding that publicly available documents "generally related to the weakening and outright disregard for underwriting guidelines by subprime originators" did not put RMBS plaintiff on notice of its claims); *In re Bayou Group*, 439 B.R. 284, 322 (S.D.N.Y. 2010) ("While the Westervelt complaint might be read as indicating 'some problem with Bayou or its top management,' … that is not the appropriate standard for determining whether a [party] is on inquiry notice."). |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 36 | May 21, 2008 | | Consolidated Amended Complaint filed in *In re Merrill Lynch & Co.*, No. 07-cv-09633 (S.D.N.Y.) | "A majority of the loans backing this securitization were issued by Owni Mortgage Solutions, a California based firm that went bankrupt in late 2006 when it was unable to repurchase loans that went bad almost immediately."  Plaintiffs in the Securities, Derivative and ERISA Actions file a consolidated amended complaint asserting securities fraud and alleging that "the reduction of mortgage underwriting standards which resulted in a substantial increase to Merrill of subprime mortgages did not satisfy Merrill's increasing need for subprime mortgage product to securitize and create mortgage backed securities ("MBSs"), which Merrill needed to feed its CDO machine. Therefore, Merrill leveraged these subprime mortgages by creating derivative securities such as credit default and total return swaps, which were based upon and mimicked the underlying subprime MBSs." ¶ 9.  Merrill "made false and | While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.*, MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007).  Litigation involving false statements by Defendants about *Defendants' own losses* are unenlightening, they do not disclose the fraud Merrill Lynch was committing with respect to Plaintiff, or with respect to Plaintiff's investments. |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 37 | Jul. 7, 2008 | *Chain of Blame: How Wall Street Caused the Mortgage and Credit Crisis* | Chapter 8: A Conspiracy by Merrill? | misleading statements and omissions by, among other things ... [f]ailing to disclose that Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ... Ownit. ... With respect to Ownit, [Merrill] instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards which provided Merrill access to a greater number of subprime mortgages." ¶ 16(b).<br><br>"Merrill's trading desk didn't actually underwrite the loans they were buying. They told the lenders what type of characteristics the mortgage could have ... bought the loans, and hired the outsourcers (Clayton, Bohan, and Opus) to conduct a final review ... [¶] Because competition was so stiff those years and because Merrill, Bear, J.P. Morgan, and other Wall Street firms were so hungry for product (which they could put into ABSs and CDOs), the goal, the underwriters said, was to pass | Defendants cite to two pages in the middle of a book that generally discusses the credit crisis. General contentions about weakening internal controls do not create inquiry notice. *See Public Emp. Ret. Sys. Of Miss. v. Goldman Sachs Grp., Inc.*, No. 09-cv-1110, 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) (holding that publicly available documents "generally related to the weakening and outright disregard for underwriting guidelines by subprime originators" did not put RMBS plaintiff on notice of its claims); *In re Bayou Group*, 439 B.R. 284, 322 (S.D.N.Y. 2010) ("While the Westervelt complaint might be read as indicating 'some problem with Bayou or its top management,' . . . that is not the appropriate standard for determining whether a [party] is on inquiry notice."). |



| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 38 | Nov. 9, 2008 | The New York Times | The Reckoning: How the Thundering Herd Faltered and Fell | as many loans as possible. ... [A Bohan employee] singled out Merrill in particular. 'They perpetuated the whole thing,' she said. If she found a loan that might rate a three, a Merrill supervisor would find a way to get the loan approved." Pages 196-97.<br><br>"The firm's goal ... was to generate in-house mortgages that it could package into C.D.O.'s. This allowed Merrill to avoid relying entirely on other order to control a constant stream of companies for mortgages. That approach seemed to be common sense, but it was never clear how well Merrill's management understood the risks in the mortgage business."<br><br>"The risk in Merrill's business model became viral after A.I.G. stopped insuring the highest-quality portions of the firm's C.D.O.'s against default. .. Rather than slow down, however, Merrill 's C.D.O. factory continued to hum ... " | The article reflects that it "was never clear how well Merrill's management understood the risks in the mortgage's business." This "lack of clarity" argues *against scienter. See Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194 (2d Cir. 2003) ("It was reasonable for Plaintiffs not to inquire into Warnaco's statements because Warnaco had provided [a] seemingly benign explanation.") *CSAM Capital, Inc. v. Lauder*, 67 A.D. 3d 149, 156 (1st Dep't 2009) ("[T]he fact the . . . letter contained non-fraudulent explanations for the fund's actions suggests that reasonable diligence would not have revealed any evidence of fraud . . . at that time."). |
| 39 | Dec. 5, | | *Connecticut* | Class action by holders of Merrill | The complaint relates to specific disclosures in the |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| | 2008 | | *Carpenters Pension Fund, et al. v. Merrill Lynch & Co., Inc.,* Case No. BC403282 (Cal. Super. Ct.) | Lynch Mortgage Trust Certificates, alleging that the certificates were sold pursuant to registration statements that "misstated, *inter alia,* the process used to originate loans and the quality of the mortgages ... In essence, [Merrill] issued mortgages to borrowers that did not satisfy the requisite eligibility criteria described in the Registration Statements ..." ¶¶ 9-10. | Registration Statements for *Mortgage Trust Certificates,* not CDOs. |
| | | | | Merrill "failed to disclose that it had dampened mortgage loan underwriting criteria in an effort to boost loan production, and thereby increase the securitization of MBS. ... Ownit was instructed to 'materially lower its underwriting standards so Merrill had access to a greater number of subprime mortgages.'" ¶ 43. | While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.,* MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). |
| 40 | Dec. 12, 2008 | | *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Serv. & Sec. L.L.C., et al.* | Class action against Merrill Lynch by purchasers of asset-backed certificates alleging "false statements and/or omissions about: (i) the underwriting standards purportedly used in connection with the underwriting | This litigation relates to specific asset-backed certificates, not CDOs. |
| | | | | | While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 41 | Jan. 16, 2009 | Bloomberg News | 08-civ-10841 (S.D.N.Y.)<br><br>*Merrill to Pay $550 Million in Subprime Settlements* | of the underlying mortgage loans … As a result of the false and misleading statements and omissions in the Registration Statement, … the Certificates were secured by assets with a dramatically greater risk profile than represented in the Registration Statement. By failing to disclose the truth about the underlying processes used to purchase those assets for sale to investors, defendants were able to obtain superior credit ratings on the Certificates …" ¶¶ 4, 8.<br><br>"Merrill Lynch & Co. will pay $550 million to settle claims by the Ohio State Teachers Retirement System and other shareholders that it misled investors about assets backed by subprime mortgages …. The company was accused of issuing false and misleading statements about collateralized debt obligations and other assets backed by subprime mortgages." | plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.*, MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007).<br><br>Defendants' disclosure of settlement of litigation involving allegedly fraudulent statements to its shareholders about *Defendants' own losses* are unenlightening; they do not acknowledge or provide evidence of the fraud it had committed with respect to Plaintiff, and Plaintiff's investments.<br><br>Further Merrill Lynch denied wrongdoing as part of the settlement. ("Although we vigorously disputed the allegations in these cases, we concluded it was best to avoid the uncertainty, distraction and costs of the litigation, and to try to achieve certainty through these settlements," Mark Herr, a spokesman for Merrill Lynch, said in an e-mailed statement."). Comfort words like this negate a finding that inquiry notice attached. *See In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 42 | Feb. 17, 2009 | | Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co., 09-cv-1392 (S.D.N.Y.) | Class action against Merrill Lynch asserting misrepresentation claims in connection with the sale of Merrill Lynch Mortgage Trust Certificates, alleging misstatements "regarding the quality of the loans underlying the Certificates and the process by which [Merrill] or First Franklin acquired those loans. Specifically, the Offering | F.Supp.2d 241, 276 (S.D.N.Y. 2010) (rejecting "Defendants' argument that plaintiffs were on inquiry notice before July 25, 2007, implies that Ambac's investors should have been aware of the company's financial troubles at a time when Ambac's own officers deny knowing that anything was wrong."); *In re Alcatel Sec. Litig.*, 382 F.Supp.2d 513, 527 (S.D.N.Y. 2005) (inquiry notice not triggered if storm warnings are negated by words of comfort from management); *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F.Supp.2d 192, 211 n.14 (S.D.N.Y. 2004) ("'Company attorney denied the allegations, stating that, 'the accounting for all of these transactions is appropriate and in accordance with generally accepted accounting principles.' . . . Because the plaintiff argues for an inquiry notice date of July 18, 2002, the Court need not reach the question of whether the statements of the Company attorney . . . qualify as "words of comfort," though it certainly appears that they do.").<br><br>The complaint relates to specific disclosures in the Registration Statements for *Mortgage Trust Certificates*, not CDOs. While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.*, MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| | | | | Documents failed to disclose, *inter alia*, that the loan originators, including but not limited to First Franklin, had systematically ignored, or abandoned their stated and pre-established underwriting and appraisal standards and that [Merrill] and First Franklin [Merrill] ignored their loan purchasing guidelines .... As a result ... Plaintiffs and the Class purchased Certificates that were far riskier than represented ..." ¶¶ 11-12.<br><br>"To bolster its loan supply, Merrill Lynch instructed, and exerted pressure on loan originators to reduce underwriting standards to increase origination quantity. Merrill Lynch exerted pressure on originators through extended credit lines and by acquiring all or part of the loan originator. For example, in 2005, Merrill Lynch purchased a 20% share in one of its primary loan originators, [Ownit] .... Merrill Lynch, using its ownership stake and a $3.5 billion credit line as leverage, then instructed Ownit to | |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 43 | Feb. 24, 2009 | | Merrill Lynch Form 10-K | Disclosure respecting consolidated Securities and ERISA Actions and four other actions alleging that Merrill sold MBS based on prospectuses containing misstatements concerning the quality of the mortgages backing the MBS. | Defendants' disclosures to the SEC of litigation involving failures to disclose *Defendants' own losses* are unenlightening; they reflect only the existence of litigation, they do not acknowledge or provide evidence of the fraud it had committed with respect to Plaintiff. *Stuehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 433 (2d Cir. 2008) ("plaintiffs were not placed on inquiry notice by the 10-K[] because the statements contained therein were not presented with 'clarity sufficient to place Plaintiffs on inquiry notice that there was the probability of fraud.'"). |
| | | | lower its underwriting standards and to originate more higher-yield, riskier loans ...." ¶ 97. | | The disclosures of lawsuits relate to *specific MBS* registrations and do not mention CDO investments at all, particularly the CDO investments made by Plaintiff. |
| | | | | | Moreover, Defendants' disclosures concerning lawsuits involving specific tranches of MBS state that a motion to dismiss will or has been filed; and/or that Merrill Lynch affirmatively denies the "principal allegations" set forth in these complaints. *See In re Ambac Fin. Group, Inc. Securities Litig.*, 693 F.Supp.2d 241, 276 (S.D.N.Y. 2010) (rejecting "Defendants' argument that plaintiffs were on inquiry notice before July 25, 2007, implies that Ambac's investors should have been aware of the company's financial troubles at a time when Ambac's own officers deny knowing that anything was wrong."); *In re Alcatel Sec. Litig.*, 382 F.Supp.2d 513, |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 44 | Mar. 27, 2009 | | *Wyoming State Treasurer v. Merrill Lynch & Co., Inc.*, No. 09-cv-3030 (S.D.N.Y.) | Class action against Merrill Lynch by investors in Merrill Lynch Mortgage Trust Certificates, alleging that the registration statements "were untrue or misleading in a number of ways, including because the underlying mortgage loans were not in fact originated in | 527 (S.D.N.Y. 2005) (inquiry notice not triggered if storm warnings are negated by words of comfort from management); *In re AOL Time Warner, Inc. Securities and "ERISA" Litig.*, 381 F.Supp.2d 192, 211 n.14 (S.D.N.Y. 2004) ("'Company attorney denied the allegations, stating that, 'the accounting for all of these transactions is appropriate and in accordance with generally accepted accounting principles.' ... Because the plaintiff argues for an inquiry notice date of July 18, 2002, the Court need not reach the question of whether the statements of the Company attorney ... qualify as 'words of comfort,' though it certainly appears that they do.'"). <br><br> *See also Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798-99 (2010) (rejecting argument in a securities fraud suit that the plaintiffs should have discovered "the facts constituting the violation" in light of prior lawsuits and an FDA warning letter alleging in general fashion that defendant had "knowledge" of the heightened risks of Vioxx.). <br><br> The complaint relates to specific disclosures in the Registration Statements for *Mortgage Trust Certificates*, not CDOs. While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law," *In re MTBE Prods. Liab. Litig.*, MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| | | | | accordance with the stated underwriting or appraisal guidelines, nor did the credit ratings or reported loan characteristics ... accurately reflect the underlying mortgage loans or the risks associated with them. Indeed, once lenders began selling mortgages for securitization (as opposed to servicing them for the life of the loan), many abandoned their underwriting and appraisal standards in order to make more loans that they could then turn around and sell to banks like Merrill for inclusion in MBS. This phenomenon was exacerbated by Merrill ... " ¶¶ 11-12.

"The materially untrue and misleading statements ... [included] representations and omissions regarding the Certificates' credit ratings, including that the credit ratings agencies providing such ratings were not independent evaluators but rather interested participants in the Offerings." ¶ 50. | *See also Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 435 (2d Cir. 2008) (the filing of a lawsuit without any publicity or regulatory disclosure does not provide inquiry notice without more).

In any event, Defendants' 10-K denied that these types of allegations had any merit. |

Case 1:12-cv-03993-VM   Document 46   Filed 10/09/12   Page 38 of 39

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|---|---|---|---|---|---|
| 45 | Apr. 30, 2009 | | *MBIA ins. Corp. v. Merrill Lynch Pierce, Fenner & Smith, Inc.,* No. 601324/09 (N.Y. Sup. Ct.) | Fraud suit alleging that "Merrill Lynch knew that its RMBS and CDO holdings had lost value and faced increasing risks of default ... well in excess of historical rates of default ... To solve this problem, Merrill Lynch resorted to a scheme of repackaging its own flagging RMBS and CDO assets into new generations of CDOs. ..." "Merrill Lynch embarked upon a strategy to flip the losing RMBS and CDO positions in its inventory into new CDOs .... in order to avoid writing down on its books its declining CDO, RMBS, and other positions, and unable to find direct investors without realizing losses, Merrill Lynch engaged in a scheme to package and repackage its most toxic assets into CDOs, which would be sold to unsuspecting investors ... As part of these 'de-risking' and loss 'mitigation strategies, Merrill Lynch designed complex CDO-squared and CDO-cubed structures and then arbitraged rating agency methodologies in | This complaint does not allege that, as Woori pleads, Merrill failed to disclose or took efforts to obscure true facts underlying the mortgages at the heart of the CDOs in an effort to secure unwarranted credit ratings. Nor does it appear to address the CDOs Woori purchased. *See Federal Housing Finance Agency v. UBS Americas, Inc.,* No. 11-cv-5201, 2012 WL 1570856, at *9 (S.D.N.Y. May 4, 2012) ("[Plaintiff]'s claim here is not that the *originators* failed to scrutinize loan applicants adequately *in general;* it is that *defendants* failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the *particular* securitizations sold to the [Plaintiff].") (emphasis in original). While awareness of other suits may be considered by a trier of fact as part of the total mix of information available to a plaintiff, "such awareness is insufficient to impute either actual or constructive knowledge to a plaintiff as a matter of law." *In re MTBE Prods. Liab. Litig.,* MDL 1358, 2007 WL 1601491, at *9 (S.D.N.Y. June 4, 2007). *See also Staehr v. Hartford Fin. Servs. Grp.,* 547 F.3d 406, 435 (2d Cir. 2008) (the filing of a lawsuit without any publicity or regulatory disclosure does not provide inquiry notice without more). In any event, Defendants' 10-K denied that these types of allegations had any merit. |

| Ex. # | Date | Source | Title | Defendants' Excerpt(s) | Plaintiff's Response |
|-------|------|--------|-------|------------------------|----------------------|
|       |      |        |       | order to obtain favorable but unwarranted credit ratings on its CDO tranches." ¶¶ 32-33. |                      |